Cite as 2025 Ark. App. 294

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR-24-660

| | | |
|---|---|---|
| JEFFREY PARSONS | | Opinion Delivered May 7, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE SALINE COUNTY CIRCUIT COURT |
| V. | | [NO. 63CR-22-934] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE RANDY WRIGHT, JUDGE |
| | | AFFIRMED |

**MIKE MURPHY, Judge**

Appellant Jeffrey Parsons brings this interlocutory appeal from the Saline County Circuit Court's denial of his motion to dismiss on the basis of double jeopardy.[1] Parsons was on trial, accused of sexually abusing his former stepdaughter, MC. The trial ended when the circuit court granted his motion for mistrial due to the victim's mother's testimony that she, too, had been sexually abused by Parsons. On appeal, Parsons argues that the circuit court erred in finding that the State did not intend to provoke a mistrial; thus, double jeopardy barred a second trial under the standard set by the United States Supreme Court in *Oregon v. Kennedy*, 456 U.S. 667 (1982). We affirm.

---

[1]A double-jeopardy claim may be raised by interlocutory appeal because if a defendant is illegally tried a second time, the right is forfeited. *Zawodniak v. State*, 339 Ark. 66, 68, 3 S.W.3d 292, 293 (1999).

On November 8, 2022, Parsons was charged with two counts of second-degree sexual assault. The underlying alleged conduct occurred between January 2016 and March 2017. The allegations were not reported to law enforcement until May 2022, when Amanda Shelnut (Parsons' ex-wife and MC's mother) contacted police to inquire why her own complaints of sexual assault by Parsons had not resulted in charges.

On January 4, 2024, a pretrial hearing was held to address multiple motions filed by Parsons. Of importance to this appeal are Parsons's request for discovery of Rule 404(b) evidence and his motion in limine to exclude mention of previous allegations—specifically, Shelnut's report of marital rape. During the pretrial hearing, the State and Parsons agreed that Shelnut would testify that she did not report MC's allegations because she was scared, but specifics would not be brought to the jury's attention. The State further stated that it did not anticipate introducing any Rule 404(b) evidence.

A jury trial was held on February 29. MC testified that on more than one occasion, Parsons would come into her bedroom before she fell asleep under the guise of bringing her a cup of water. She recalled that he would then lie in her bed and lift her nightgown and put his hands in her underwear. MC did not recall when she told her mother about the abuse, but she was interviewed about it in May 2022 when she was fourteen.

On cross-examination, Parsons inquired about the interview MC gave in 2022. MC said she was around nine years old the last time Parsons touched her, but she could not definitively recall when the last time occurred. She also could not recall how old she was when he first touched her. In the interview, she could not recall if Parsons had touched the

inside or outside of her vagina, but at the hearing, she testified it was the inside. MC testified that before she disclosed the allegations, her brother told her that Parsons had physically abused Shelnut. During the interview, MC stated that once she found out about her mom, she felt comfortable talking about her abuse. MC acknowledged that her brother was accused of inappropriately touching her around this time but that he did not do it. Her brother would have been around twelve or thirteen.

Shelnut testified next. She testified that she became aware of MC's allegations once Parsons moved out in March 2017. She said that at this time, Parsons had accused her eldest son of inappropriately touching MC. During her testimony, Parsons's counsel interrupted and asked to approach once it sounded as if Shelnut was about to discuss how Parsons had previously acted toward her. The State told the court that it was not trying to elicit Shelnut's testimony about how Parsons had acted toward her and that it would rephrase and be more direct. Shelnut then testified that once Parsons had made the allegations about her son, she questioned all the children, and they adamantly denied that it had happened. According to Shelnut, it was during this questioning of the children that MC came out and said she had been inappropriately touched by Parsons. Shelnut testified that she did not go to the police because she was scared of Parsons and did not think she would be believed because Parsons had been a respected officer with the City of Benton until he went to work for Union Pacific Railroad.

Shelnut testified that in May 2022, she met with Captain Haworth at the Benton Police Department. She had scheduled this meeting to discuss the outcome of Parsons's

other trial involving his other ex-wife. Captain Haworth inquired about allegations that her son had molested MC.[2] At that point, Shelnut told Haworth that it was actually Parsons.

On cross-examination, Shelnut testified that the first time MC confided in her in 2017, MC said "she wasn't honestly sure anything even happened." When Shelnut was interviewed about the allegations, she said that she saw Parsons in MC's bed one time but did not think it was inappropriate. Parsons asked her if a case had ever been brought regarding her personal allegations against him, and she responded no. She had made her allegations "some year and a half prior to the plea in" the ex-wife's case. Shelnut testified that she was invested in the ex-wife's case because "[i]t would have been nice to see him pay for how he treats women."

Before conducting redirect examination, the State asked to approach the bench. A bench conference was conducted to discuss whether Parsons had opened the door to Shelnut's allegations of alleged abuse. The State argued that it intended to get Shelnut to say she was interested in the ex-wife's case because she was a domestic-abuse victim herself and not because she was a petty ex-girlfriend or wife. The court limited the State's redirect to inquiring about Shelnut's being a victim of physical abuse by Parsons. The State told the court that that would be the only question asked on that point and that it would then move on.

---

[2]Captain Haworth had learned of these allegations from an interview with the other ex-wife. The ex-wife had mentioned in her interview that Parsons told her the reason he left Shelnut was because she was allowing her son to molest her daughter and not doing anything about it.

4

The State then asked Shelnut why she was so interested in the other case against Parsons, and Shelnut stated, "[B]ecause I had been abused by the defendant also." Shelnut was then asked what she had told the kids, to which she replied that the kids already knew that Parsons had hit her. Parsons objected on the basis of speculation, and the objection was sustained. The State then said, "Just tell us what you told them," and Shelnut responded, "That Jeff had hit me, that Jeff had sexually abused me." At this time, Parsons's counsel asked to approach. The court immediately stated, "[T]hat's not what—that's outside the ruling." Parsons requested a mistrial, arguing that the testimony of sexual abuse was the evidence in the file that he did not want referenced because it was overly prejudicial and that an admonition would not cure the error. The State responded,

> I am going to not ask another question and be done. And that is ~ that is a million percent not my intent. I was not trying to bring that up at all. I was trying to get to what was told to the kids, and why that was done. And I ~ that was my mistake. And I think now if I ask ~ I think I can ask ~ say I asked the wrong question. I think I can ask why did you do it? And that was my mistake.

The State went on to say, "I never had any intentions of bringing it up or making that an issue. I was intending to just talk about the physical abuse that was asked about."

The court reviewed the testimony and granted the mistrial. It prefaced the ruling by saying,

> [When the court tried cases I] would look back and go, I probably should have discussed this after my ruling with the witness to make sure it didn't happen, and that just didn't happen today. And it's nobody's fault. You're both good lawyers. You do a good job. Had a good trial. But at this point, the Court will grant the motion for mistrial, as much as I hate it. I assure you. I don't think it does a lot of good for anybody.

After setting a new trial, the court again stated that "this just happens in the practice of law and the way you try cases. And it's not anybody's fault. We just move on and deal with it and go forward, so ~ but in an abundance of caution, the Court is ruling for a mistrial at this time."

On July 12, 2024, Parsons moved to dismiss on double-jeopardy grounds, claiming that the State impermissibly goaded Parsons into asking for a mistrial. The court denied Parsons's motion, and he now appeals.

We review a circuit court's denial of a motion to dismiss on double-jeopardy grounds de novo. *Winkle v. State*, 366 Ark. 318, 235 S.W.3d 482 (2006). When the analysis presents itself as a mixed question of law and fact, we give the factual determinations made by the circuit court due deference and will not reverse them unless clearly erroneous. *Id.* at 320, 235 S.W.3d at 483. However, "the ultimate decision by the circuit court that the defendant's protection against double jeopardy was not violated is reviewed de novo, with no deference given to the circuit court's determination." *Green v. State*, 2011 Ark. 92, at 4, 380 S.W.3d 368, 371.

In *Kennedy*, 456 U.S. at 672, the United States Supreme Court held that the Double Jeopardy Clause does not bar the reprosecution of a defendant in cases in which prosecutorial misconduct causes the defendant to move for a mistrial. The Court established a narrow exception to this rule that "where the governmental conduct in question is intended to 'goad' a defendant into moving for a mistrial," the Double Jeopardy Clause bars

the retrial of the defendant. *Kennedy*, 456 U.S. at 676.[3] The examination of the prosecutor's intent calls for the circuit court to make a finding of fact by inferring the existence or nonexistence of intent from objective facts and circumstances. *McClendon v. State*, 2017 Ark. App. 295, at 6, 523 S.W.3d 374, 377.

Parsons argues that the State intended to provoke him into moving for a mistrial "given how terrible the alleged victim's and her mother's testimony had gone," which he contends is crucial for the State's case that relies solely on credibility. Specifically, Parsons directs us to MC's testimony noting that she was unable to provide simple but important details of the alleged touching and that her story changed, implying that she was not a credible witness. Parsons also contends that Shelnut's testimony was not beneficial to the State's case, citing testimony such as her failure to report the allegations until after law enforcement questioned her about not reporting the allegations against her son. Parsons also asserts that the prior allegations of sexual assault had been discussed multiple times and were clearly a matter of importance in this case.

As the trial court found from the bench and reiterated in its order denying Parsons's double-jeopardy motion, the State's mistake was unintentional. Indeed, the court said it was granting the motion in an abundance of caution and that "it's nobody's fault" and "this just happens." As the State pointed out, asking Shelnut to "[j]ust tell us what you told them"

---

[3]We are currently one of thirty-four states that have formally adopted this "*Kennedy* standard." Emily McEvoy, *When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct: A Call for Broader State Protections*, 122 Colum. L. Rev. 173, 188 (2022).

was not a tailored question in hindsight, but the court determined that the prosecutor had no intention of eliciting the improper testimony. The prosecutor crafted a poor question, but it did not blatantly ignore the court's ruling. Moreover, leading up to the question, there had not been any indication or warning that continued misconduct could lead to a mistrial. *See* 6 Wayne R. LaFave et al., *Criminal Procedure* § 25.2(b) (4th ed.), Westlaw (database updated Nov. 2024) (explaining that in inferring intent, courts may may consider the strength of the evidence, along with the timing of the misconduct, the immediate event that provoked the misconduct, and whether it came after a trial court warning that continued misconduct could lead to a mistrial).

Despite Parsons's claims, MC's and Shelnut's credibility had not been jeopardized. The State anticipated testimony concerning Shelnut's delay in disclosure of the assault. Further, it is entirely plausible that there would be lapses of memory in a case in which the allegations had taken place over seven years earlier when the victim was under ten years old. Parsons's argument is a speculative assertion that the State believed the trial was going badly, and the victim's credibility had been damaged.

We defer to the circuit court's factual determination that the prosecution's error was not deliberate. Accordingly, we affirm the circuit court's decision denying Parsons's motion to dismiss

Affirmed.

KLAPPENBACH, C.J., and ABRAMSON, J., agree.

*Digby Law Firm*, by: *Bobby R. Digby II* and *Mathew R. Ingle*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.